ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| MIC/CCS, Joint Venture | ) ASBCA No. 58023 |
| | ) |
| Under Contract No. F42650-03-D-0010 | ) |

APPEARANCES FOR THE APPELLANT:      Richard C. Johnson, Esq.
                                    John S. Pachter, Esq.
                                    Keeley A. McCarty, Esq.
                                    Richard H. Snyder, Esq.
                                      Smith Pachter McWhorter PLC
                                      Vienna, VA

                                    Patrick Hendrickson, Esq.
                                      Hendrickson Law Firm
                                      South Jordan, UT

APPEARANCES FOR THE GOVERNMENT:     Col Robert J. Preston II, USAF
                                      Acting Air Force Chief Trial Attorney
                                    Jeffrey M. Lowry, Esq.
                                    Skye Mathieson, Esq.
                                    Anna F. Kurtz, Esq.
                                    Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE SCOTT
## ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

MIC/CCS, Joint Venture (MIC/CCS) has appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from the deemed denial of its 29 December 2011 claim seeking payment of allegedly completed line items under Delivery Order (DO) No. 0383 under the subject contract. Appellant moves for summary judgment, alleging that it is entitled to payment for work performed prior to the DO's termination for default. The government opposes the motion. For the reasons stated below, we deny the motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On 31 March 2003, the Air Force awarded the subject multiple-award Indefinite Delivery, Indefinite Quantity Section 8(a) set-aside contract for design and construction services at Hill Air Force Base, Utah, and other sites to MIC/CCS for a one-year base period with seven option years. The contract was awarded pursuant to a Simplified Acquisition of Base Engineering Requirements (SABER) solicitation. (R4, tab 1)

2. The contract contained Federal Acquisition Regulation (FAR) 52.216-18, ORDERING (OCT 1995), which provides in part that: "(b) All [DOs]...are subject to the terms and conditions of this contract. In the event of a conflict between a [DO]...and this contract, the contract shall control" (R4, tab 1 at 16). The contract incorporated the following FAR clauses potentially relevant to MIC/CCS's entitlement to payment, the required quality of its work, and the prerequisites to reimbursement of its alleged stand-by costs: FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) (R4, tab 1 at 15); FAR 52.236-5, MATERIAL AND WORKMANSHIP (APR 1984) (*id.*); FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 1 at 10); FAR 52.246-12, INSPECTION OF CONSTRUCTION (AUG 1996) (R4, tab 1 at 9); and FAR 52.246-21, WARRANTY OF CONSTRUCTION (MAR 1994) (R4, tab 1 at 15).

3. The contract also contained clause 5352.236-9005, ORDERING PROCEDURES – SABER (AFMC) (JUL 1997) (R4, tab 1 at 32), which provides in part as follows:

> (c) Upon establishment of the scope of the individual requirement, the Contractor shall then prepare the proposal for accomplishment of the task.
>
> (1) Part 1, Section C, of the Unit Price Book shall serve as the basis for establishing the value of the work to be performed on a unit price basis.
>
> (2) Nonpriced work, if required, must be separately identified in the Contractor's proposal.
>
> ....
>
> (d) Upon receipt of the Contractor's proposal, the Government will review the proposal for completeness. The Government will negotiate with the Contractor all nonpriced items, quantities for the prepriced items and performance time.
>
> (e) [DOs] will then be issued by the [CO].... Each [DO] will include the following information:
>
> ....
>
> (3) Item number and description, quantity and unit prices for prepriced and nonpriced items and total.
>
> (4) [DO] price, delivery or performance date.

2

The parties agree that the type of work required by the DO was "nonpriced work" and that the prices were derived from the proposal of the drilling subcontractor, Layne Christensen Company (Layne) (app. mot. at 3, ¶ 5; gov't opp'n at 1, ¶ 5).

4. In August 2010, the Air Force issued a Statement of Work (SOW), as amended, for a "Re-Drill Well 7 and Repair/Reline Well 1" project (R4, tab 4 at 1-2, tab 6). Mr. Rodney Sanders was the Air Force's SABER project manager (R4, tab 2 at 2). MIC/CCS forwarded Layne's draft scope of work to Mr. Sanders on 17 September 2010. Under the draft Layne would be responsible for repairing Well #1 and drilling the replacement for Well #7. (R4, tab 19)

5. An internal email of 21 September 2010 noted that MIC/CCS would decline to submit a proposal because the drilling subcontractor proposals it had received did not comply with the SOW; the quotes were qualified with unit rates for work accomplished and unit pricing for delays, standby, etc.; none of the drillers were guaranteeing water quality; and all were providing daily rates for delays, unforeseen conditions, etc. (R4, tab 22 at 2). MIC/CCS stated as follows:

> In order for MIC/CCS to provide a proposal, the Government
> would need to agree to accept the conditions and
> qualifications in the subcontractor's proposal, plus markups
> to MIC/CCS for the various unit prices and daily rates in case
> of delays or differing site conditions. Basically this would
> change the project to a unit rate fixed price contract with a
> not-to-exceed amount with no guarantee of performance.

(R4, tab 22 at 3) MIC/CCS forwarded the email to Mr. Sanders (R4, tab 25). MIC/CCS alleges that, because the Air Force received a copy of this email, and because it ultimately accepted MIC/CCS's proposal, the Air Force agreed that the DO was changed to a unit rate fixed-price contract.

6. Later on 21 September 2010, MIC/CCS informed CO Douglas Young and Mr. Sanders that it was "willing to turn in a number on this project" if the Air Force would acknowledge the subcontractor's conditions and qualifications and use its proposal instead of the SOW (R4, tab 22 at 1-2). MIC/CCS attached a copy of Layne's pricing proposal, which broke down the work on each well into components, with a unit price, a quantity, and a total price for each. Layne's pricing included a Loss of Fluids clause, which would compensate it at $550 per hour plus costs and a 20% markup, for all drilling fluid materials and additives used during a loss of fluids period. The proposal assumed 24/7 drilling and that well design was subject to change. (R4, tab 22 at 2 and at Layne proposal) In a subsequent email to the CO and Mr. Sanders, MIC/CCS stated that "[t]he total for the project would be $1,757,438.00[.] I just need the response and I can...bring up the proposal" (R4, tab 21 at 1).

3

7. Mr. Sanders replied that, after discussing the project with Layne, and its drilling process, the Air Force felt comfortable with MIC/CCS's proposal, which he asked MIC/CCS to submit to the CO (R4, tab 22 at 1). MIC/CCS submitted a proposal dated 22 September 2010, which attached Layne's proposal (R4, tab 2 at 6-44).

8. MIC/CCS's proposal, marked "**Preliminary Estimate**," stated that it would "perform this project for the total price of *$ One Million Seven Hundred Fifty Seven Thousand Four Hundred Thirty Eight Dollars and no Cents. ($1,757,438.00)*" in **300** days (R4, tab 2 at 6). It stated that its proposal was based upon Layne's proposal, not the government's SOW, including Layne's "**unit rates for work accomplished and unit pricing for delays, etc. plus MIC/CCS markups**" and that it incorporated all of Layne's "assumptions, exclusions, clauses, compensations, and hourly pricing to perform work" (R4, tab 2 at 13, 15).

9. Layne's proposal included tables for Well #1 and Well #7 work items, which indicated a unit of "LS," "FT," or "HR" ("lump sum," "per foot," "per hour" (app. br. at 6, ¶ 15)); a unit price; a quantity; and a total price for each line item (R4, tab 2 at 7-8). The proposal stated that a "**maximum adder**" of $75,000 had been "**added to the overall contract price**" to cover loss of fluids situations; the hourly quantities were maximum billable quantities; and once Layne was operational, its hourly standby rate ($450) would apply if the government delayed it (*id.* at 8-9). Layne stated that the "estimated total of all costs, including the (worst case) loss of fluids adder is $1,310,804.00" (*id.*). MIC/CCS claims, and the Air Force disputes, that Layne's drilling plan called for drilling 24 hours per day, 7 days a week, and that this was pertinent in determining any standby (app. mot. at 9, ¶ 27; gov't opp'n at 5, ¶ 27).

10. With regard to Wells #1 and #7, MIC/CCS's proposal stated that it would provide all labor and materials outlined in Layne's proposal "at the quoted unit prices, per foot prices, and LS pricing, plus MIC/CCS markups," and any additional work or requirements would be subject to additional costs, time, and down time delays (R4, tab 2 at 15). MIC/CCS's proposal also noted that it did not guarantee the production, rate, or quality of water from the wells (R4, tab 2 at 13, 18).

11. On 22 September 2010, MIC/CCS advised the Air Force that, if the project were awarded to MIC/CCS JV, the DO was not to refer to the government's SOW in any way—only to MIC/CCS's scope of work and Layne's proposal. Otherwise, MIC/CCS would not accept it. The CO responded that he would either omit reference to the SOW or change it. (R4, tabs 28, 29 at 1)

12. The Air Force awarded DO No. 0383 to MIC/CCS on 22 September 2010 (R4, tab 2 at 1). Under Section B, Supplies or Services and Prices, the DO contained a single contract line item, in the lump sum of $1,757,438.00, which stated:

> Redrill Well #7 & Repair/Reline Well #1
> FFP [Firm-Fixed-Price]
> The purpose of this project is to redrill well #7 and repair and
> reline well #1 at Hill AFB. The work shall be done in
> accordance with the contractor's proposal dated 22 Sep 2010,
> and according to the terms and conditions of the basic
> contract.

(R4, tab 2 at 2)

13. The Air Force issued the Notice to Proceed on 5 October 2010; work was to begin by 14 October 2010 and to be complete by 11 August 2011 (R4, tab 32).

14. On 10 December 2010, Layne informed MIC/CCS that it had finished installing the new well liner in Well #1 and that the well was pumping virtually no sand. On 13 December 2010, Mr. Sanders inquired of Seth Dixon, MIC/CCS's project manager, why the well was pumping sand. Mr. Dixon replied that the cause was unknown and that Layne would pursue the issue. (R4, tab 54)

15. MIC/CCS asserts that it had completed all Well #1 work (app. mot. at 9-10 ¶ 28, aff. of Robert D. Newberry, chief executive officer of Cadence Contract Services, LLC, a joint venture partner of MIC/CCS, who had operational responsibilities for the subject contract, ¶¶ 4, 5, 9). The Air Force disagrees (gov't opp'n at 5, ¶ 28).

16. By 25 April 2011, Well #1 had developed holes (R4, tab 99). On 26 April 2011, Mr. Sanders informed Mr. Dixon that if investigation resulted in some unknown source, then the Air Force would not hold the contractor responsible for any more repairs, but if there were "holes/penetrations (i.e. bad weld, collapsed screen, etc[.]) then the contractor(s) need to meet their contractual obligation and provide the fix" (R4, tab 102).

17. The government, MIC/CCS and Layne met on 25 May 2011 to discuss Well #1. The CO recorded that Layne stated there was a problem with holes developing in the well and the contractor wanted $50,000 to perform its proposed solution, otherwise it would consider Well #1 work complete. (R4, tabs 114, 115 at 1, tab 119)

18. On 26 May 2011, the CO advised MIC/CCS that it had not fulfilled its obligations under the DO (R4, tab 120). On 31 May 2011, MIC/CCS stated that it considered Well #1 complete (R4, tab 123 at 2).

19. The CO responded as follows:

> [The government's] position in regards to Well #1 is that we
> awarded a [DO] to fix a well where we were getting no water.
> To have a well that produces water is the basic purpose of this

5

[DO] and is what you proposed on. We agree that Potable
Water is not an issue but water production is. Because of this
issue, we cannot accept [MIC/CCS's] offer of 31 May 2011.

(R4, tab 125 at 1) The CO stated that the 72-hour constant rate test had not been performed on Well #1; DO performance had not been good; and it appeared that the contractor would not complete it by the 11 August 2011 due date (*id.* at 2).

20. On 25 March 2011, Layne began to suffer fluid loss while drilling replacement Well #7 (R4, tab 3-24). On 31 March 2011, it informed MIC/CCS that it had reached the $75,000 limit under the Loss of Fluids clause. MIC/CCS advised the government that, thereafter, any loss of fluids would be at Layne's expense. (R4, tab 84)

21. On 1 April 2011 MIC/CCS sought permission to submit "another billing" for Wells #1 and #7, at 40%, stating that about 50% of the drilling had been completed and Well #1 had been reworked. Mr. Sanders and another Air Force employee agreed to the 40%. (R4, tab 88)

22. On 15 June 2011, MIC/CCS notified the government that it considered "the migration of sand/gravel pack into Well #1" to be a differing site condition. MIC/CCS gave its plan for proceeding with the well work and stated that it could not yet ascertain the costs. (R4, tab 126 at 3)

23. On 16 June 2011 MIC/CCS notified the CO that Layne had experienced "extreme losses of fluid circulation" at Well #7, which Layne believed was a changed condition (R4, tab 127 at 2). On 1 July 2011, MIC/CCS forwarded to the Air Force Layne's 28 June 2011 letter advising that, although it had not stopped work on Well #7, the loss of fluids had rendered the specified method of construction ineffective (R4, tab 130). The Air Force disputes that Layne had not stopped work on Well #7 and asserts that no work was performed after the 16 June 2011 notice (gov't opp'n at 6, ¶ 35).

24. On 13 July 2011, MIC/CCS sought to confirm the CO's alleged instructions that it should perform no more work on Well #7 pending government review of a forthcoming differing site conditions claim (R4, tab 134 at 1). The CO responded on 13 July 2011 that he understood MIC/CCS to be claiming costs it had already allegedly incurred and costs that it planned to incur if a change were approved. He advised that he could not authorize MIC/CCS to incur costs above the contract amount and asked for its claim. (R4, tab 135)

25. By letter to the CO of 28 July 2011, MIC/CCS submitted Layne's "Well #7 Change of Conditions Claim," which sought $374,076 for its alleged extra costs in addressing loss of fluids and $715,040 to implement an alternative drilling method. Neither document contained the claim certification required by the CDA, 41 U.S.C. § 7103(b). (App. supp. R4, tab A-231)

6

26. Bilateral Modification No. 01 extended the completion date to 26 September 2011 to allow for a differing site conditions investigation (R4, tab 143). By letter to the CO of 21 October 2011, MIC/CCS noted that the completion date had passed and requested a meeting regarding the alleged differing site conditions claim and the government's direction. It appended a copy of a 20 October 2001 Layne invoice, which included an unpaid amount of $75,000 for loss of fluids and $756,000 in standby charges as of 10 August 2011. (R4, tab 146)

27. On 18 November 2011, MIC/CCS asserted that the DO and both wells were complete to the extent practicable and that further performance would increase costs without achieving well performance. To the extent the DO was not complete, MIC/CCS alleged that the government's inaction regarding the DO and its failure to act on MIC/CCS's claim constituted a constructive termination for convenience. In either case MIC/CCS asserted that the government owed MIC/CCS payment. If the DO was complete, the government should pay for work performed and issue a CO's final decision on the pending claim. If the DO was deemed to be terminated for convenience, the Air Force should treat the claim as a termination settlement proposal. (R4, tab 154)

28. On 14 December 2011, MIC/CCS informed the government that Layne demobilized from Well #7 (R4, tab 158).

29. On 15 December 2011, the CO denied that the work was complete and that the government's actions constituted a constructive termination for convenience. He stated that an independent contractor, Bowen Collins, was investigating the alleged differing site conditions. (R4, tab 159)

30. MIC/CCS submitted a "Pre-Final" invoice No. 8, dated 16 December 2011. The invoice noted the DO's $1,757,438 price and showed $2,223,660 due, which was $466,222 over that price. It reflected a government payment of $878,719, for a net amount said to be due of $1,344,941. Among other things, the invoice covered alleged 100% completion of Well #1; 67.95% completion of Well #7; and Well #7 standby costs at $517.50 per hour, for a total of $1,030,860. (R4, tab 160 at 3, 5-6)

31. The CO replied on 21 December 2011 that, pending the outcome of the differing site conditions investigation, the contract's terms and conditions had not been met and the government would not sign the invoice (R4, tab 161 at 4).

32. MIC/CCS submitted a certified claim to the CO by letter of 29 December 2011, seeking payment of its $2,223,660 invoice (R4, tab 162).

33. Bowen Collins submitted its report to the government on 8 February 2012. Regarding Well #1, it concluded that faulty materials or construction, specifically liner material or installation, caused the filter pack to enter the well. Concerning Well #7, it

determined that there were no changed conditions and that the difficult drilling conditions should have been known to Layne when it bid. (R4, tab 163)

34. MIC/CCS appealed the deemed denial of its claim on 6 March 2012 (R4, tab 167).

35. The CO also issued a show cause notice to MIC/CCS on 6 March 2012, stating, *inter alia*, that the government was considering terminating the DO for default due to MIC/CCS's failure to perform within the time required (R4, tab 168).

36. On 12 March 2012, MIC/CCS contended, among other things, that the government had not responded to its differing site conditions allegations and any failure to perform was the government's responsibility. It reiterated that the DO had been completed to the extent practicable and that the amount owed was the same whether the DO was deemed to be complete or terminated for convenience by the government. It stated that it was finished with its work under the DO. (R4, tab 169)

37. CO David J. Clark issued a final decision dated 18 June 2012 terminating the DO for default, citing MIC/CCS's alleged failure to complete the contracted work and to proceed diligently with performance pending review of its differing site conditions claims (R4, tab 170). The CO stated that MIC/CCS not only failed to repair and reline Well #1 but had also damaged it, and that it had failed to complete Well #7, leaving "an unusable hole in the ground" (*id.* at 2). The CO also stated that an independent study had found MIC/CCS's changed conditions allegations to be without merit. The decision did not assess liquidated damages. MIC/CCS appealed from the default termination on 18 July 2012 and the Board docketed the appeal as ASBCA No. 58242.

38. Appellant submitted Mr. Newberry's 22 January 2013 affidavit (*see* SOF ¶ 15), alleging that MIC/CCS had completed all required work for Well #1, listing several work items. He also alleged, regarding Well #7, that MIC/CCS had stored materials on site valued at about $150,000 for which it expected to be paid but the Air Force had refused payment. (App. mot., Newberry aff. ¶¶ 9, 14) Appellant also submitted the 21 March 2013 affidavit of Joshua T. Nabb, Layne's account manager, which listed testing performed on Well #1, "[a]fter completion of the work" (*id.*, Nabb aff. ¶ 13).

39. The government submitted the 28 June 2013 declaration of Regina E. Chihuahua, supervising CO of the SABER contract, the DO, and replacement contract work. She alleged that replacement work, under solicitation as of 28 June 2013, to perform the work originally required under the DO, which was priced at $1,757,438, was estimated to cost the Air Force $1,699,468 (gov't opp'n, Chihuahua decl. ¶¶ 1-3). The Air Force has not contended that liquidated damages have been assessed.

8

## DISCUSSION

### The Parties' Contentions

Appellant contends that it is entitled on summary judgment to payment for completed and partially completed line items net of any payments previously made. It alleges that the DO contained unit prices for individual work items and thus was not a lump sum or fixed-price contract. Rather, it was a unit-priced contract under which the contractor was to be paid the DO's unit prices for work performed. Appellant describes its alleged entitlement as follows:

> No one would or could maintain that a price of so much per foot or so much per hour entitled MIC/CCS to be paid a firm fixed price, regardless of how many feet or how many hours of effort it performed. *Its entitlement was measured by how much of each item of work it accomplished*, and the obligation of the Air Force was similarly measured. MIC/CCS made this clear to the Air Force before the DO was issued and the Air Force agreed. [Emphasis added] [Citation omitted]

(App. mot. at 22) Appellant concludes that the default termination did not affect its right to payment.

The Air Force responds that summary judgment is not appropriate because MIC/CCS relies on disputed material facts:

> Primarily, MIC/CCS asserts that it is undisputed that its proposals "were accepted by the Government as setting forth the contract terms." However, the facts MIC/CCS cites to only support that the [SOW] and method of performance were dictated by its proposal. The Government understood that the [DO] was governed by the SABER contract, the terms of the [DO] and that the *work* was to be done "in accordance with the contractor's proposal...". [Citations omitted]

(Gov't opp'n at 9)

The Air Force adds that, even if there were no disputed material facts, MIC/CCS is not entitled to judgment as a matter of law. It asserts that, under its clear language, the DO was a firm-fixed-price order for construction services, entitling MIC/CCS to a lump sum payment for successful performance of work in accordance with the SOW. The Air Force alleges that it is also clear from MIC/CCS's proposal that the individually priced estimates of work elements necessary for completion of the Wells ## 1 and 7 work were

9

not severable and were dependent upon one another. It contends that appellant's construction of the DO as an agreement that MIC/CCS would be paid for whatever work items were completed is absurd. The Air Force claims that, if MIC/CCS believed that its proposal clearly provided for a unit pricing payment structure, then the DO was patently ambiguous, and the contractor's failure to raise the ambiguity in a timely manner precludes it from doing so now.

The Air Force also contends that the DO was terminated for default in part due to MIC/CCS's failure to complete performance, and that the work done was of little or no value to the government, which is entitled to recover the value of replacement work from MIC/CCS. Finally, the Air Force alleges that, regarding its claimed standby costs, MIC/CCS has not established that it was on standby and that it did not continue performance at the government's direction.

Appellant replies that the DO is not clear but is ambiguous concerning pricing. However, the ambiguity can be resolved by reference to the surrounding documents and no testimony on the issue is necessary or should be allowed. Appellant contends that it has supplied uncontroverted affidavits concerning the work it completed and its standby charges are supported by the DO's terms. It also asserts that the government's right to reprocurement costs has lapsed due the passage of time and, as of briefing, it had not yet incurred the costs.

## Summary Judgment Standards

The summary judgment standards are well-established. It is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. The moving party bears the burden to show the absence of any genuine issue of material fact. We resolve any significant doubt over factual issues, and draw all reasonable inferences, in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). There is a genuine issue of material fact that will bar summary judgment if a reasonable fact-finder could find in favor of the nonmovant based upon the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *AshBritt, Inc.*, ASBCA Nos. 56145, 56250, 2009-2 BCA ¶ 34,300 at 169,434.

## Appellant has Not Shown that there are No Disputed Material Facts

We first consider whether appellant has met its burden to show the absence of any genuine issue of material fact. Its claim is based upon its 16 December 2011 invoice, which seeks payment for work alleged to have been completed prior to the DO's termination for default on 18 June 2012 (SOF ¶¶ 301, 37). When a contract is terminated for default, the contractor is entitled to payment for the value of work it properly performed in accordance with the contract prior to the termination. *Red Sea Engineers & Constructors, Inc.*, ASBCA No. 57448 *et al.*, 13 BCA ¶ 35,245 at 173,031, *modified on*

10

*recon.*, 13 BCA ¶ 35,298. However, if the amount remaining on the contract price is insufficient to cover the government's cost to complete, and any liquidated damages assessed, the contractor's payment is reduced by the excess amount. *J.G. Enterprises, Inc.*, ASBCA No. 27150, 83-2 BCA ¶ 16,808 at 83,543.

Appellant asserts that the value of work it performed prior to termination is $2,223,660, which is $466,222 over the DO's price, as reflected in the 16 December 2011 invoice. The Air Force has paid only $878,719 and therefore owes appellant the invoiced $1,344,941. (SOF ¶ 30; app. mot. at 23) Although Messrs. Newberry and Nabb made blanket assertions in their affidavits about completion of required items of work on Well #1 and testing on that well, respectively (SOF ¶ 38), this is not enough to conclude that no reasonable trier of fact could find other than for the moving party. *See Philadelphia Biologics Center*, ASBCA No. 44578, 95-2 BCA ¶ 27,805 at 138,642 (invoice had no value in establishing entitlement and supporting affidavit was insufficient to do so). Appellant points to no persuasive evidence verifying that the invoice accurately reflects the amount of work actually performed, or that the claimed work conformed to the DO. *See Red Sea Engineers & Constructors*, ASBCA No. 57448, 11-2 BCA ¶ 34,880 at 171,550-51 (in connection with default termination, lack of such evidence raised genuine issues of material fact precluding summary judgment on contractor's claim for invoice payment under Payments clause), *aff'd on recon.*, 12-1 BCA ¶ 34,945.

The FAR Payments, Material and Workmanship, Inspection of Construction and Warranty of Construction clauses, to which the DO is subject under the Ordering clause, call for work that meets the contract's requirements and quality standards (SOF ¶ 2). The Air Force disputes that MIC/CCS and its subcontractor had completed all required items of work on Well #1 in a manner consistent with the contract requirements and that required Well #1 testing had been accomplished (SOF ¶¶ 15, 19, 29, 31, 35, 37; gov't opp'n at 5, ¶ 28). Indeed, the Bowen Collins report opined that faulty material or faulty installation of the well liner caused the excessive sand production in Well #1 (SOF ¶ 33). Thus, a genuine issue of material fact exists regarding whether the Well #1 work conformed to the contract requirements.

A large part of appellant's claim is that it is entitled to $1,030,860.00 in standby costs (SOF ¶ 30). Appellant claims that it is entitled to such costs based upon the DO's incorporated standby rates (*see* SOF ¶¶ 5, 9; app. mot. at 9, ¶ 27). The government asserts that the terms of the SABER contract control over those of the DO and that the contract's Suspension of Work clause governs standby entitlement (*see* SOF ¶ 2; gov't opp'n at 5, ¶ 27). Appellant replies that its standby terms do not conflict with the Suspension of Work clause but merely supplement it (app. reply at 4).

Here, factual issues preclude summary judgment on the alleged standby costs aspect of appellant's claim. For instance, the parties dispute whether Layne stopped work on Well #7 after its 16 June 2011 changed conditions notice and whether the CO

directed MIC/CCS to stop work on that well (SOF ¶¶ 23, 24; app. mot. at 11-12, ¶¶ 35, 40; gov't opp'n at 6-7, ¶¶ 35, 40).

Even if appellant had established that it properly performed work in accordance with the DO prior to its termination, and had proved the value of that work, the government still claims that it is entitled to offset any amount due by its reprocurement costs (*see* SOF ¶ 39; gov't opp'n at 13-14). Appellant disputes the factual and legal bases for this contention (app. reply at 6-7).

Lastly on factual matters, the reasonableness of the government's actions is at issue. Summary judgment normally is not appropriate when this is in question. *McKenzie Engineering Co.*, ASBCA No. 53374, 02-2 BCA ¶ 31,972 at 157,925.

<u>Appellant has Not Shown that It is Entitled to Judgment as a Matter of Law</u>

Even if there were no disputed material facts, appellant has not established that it is entitled to judgment as a matter of law. In resolving a question of contract interpretation, we ascertain the parties' intent. *Southbridge Associates, LLC*, ASBCA No. 54628, 05-1 BCA ¶ 32,855 at 162,799. The parties dispute whether the DO was a lump sum, firm-fixed-price contract or a unit priced contract. Citing the parties' pre-award emails (SOF ¶¶ 5-7, 11), appellant asserts that the Air Force agreed to unit rate pricing terms by incorporating MIC/CCS's proposal into the DO. The government counters that the DO only incorporated appellant's SOW and that the CO did not indicate that he intended to alter the DO's pricing structure. The government further disputes the import of the email correspondence upon which appellant relies. (Gov't opp'n at 12)

Legal questions of contract interpretation are generally amenable to summary judgment, unless there is an ambiguity that requires weighing extrinsic evidence, but extrinsic evidence will not be received unless there is such an ambiguity. *Dixie Constr. Co.*, ASBCA No. 56880, 10-1 BCA ¶ 34,422 at 169,918. Appellant contends that the DO was ambiguous concerning pricing, but that no resort to extrinsic evidence is necessary other than examining surrounding documents, which make it "crystal clear" that the parties intended to enter into a unit rate-type contract (app. reply at 2). As noted, the Air Force contends that any ambiguity was patent and appellant is untimely in raising it. *See Dick Pacific/GHEMM, JV*, ASBCA Nos. 54743, 55255, 09-2 BCA ¶ 34,178 at 168,965 (contractor's duty of inquiry about patent ambiguities).

Here, the parties' intentions, the DO's interpretation, and appellant's entitlement to payment are disputed. We do not yet have enough information to resolve these disputes. Mixed questions of fact and law are present that pose triable issues precluding summary judgment. *AshBritt, Inc.*, ASBCA Nos. 56145, 56250, 09-2 BCA ¶ 34,300 at 169,434.

## DECISION

We deny appellant's motion for summary judgment.

Dated: 22 July 2014

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

ELIZABETH A. TUNKS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58023, Appeal of MIC/CCS, Joint Venture, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

13